Thomas A. Vogele, Esq.  (SBN 254557)
Teddy T. Davis, Esq. (SBN 221859)
THOMAS VOGELE & ASSOCIATES, APC
3845 Via Nona Marie, Unit 22113
Carmel, California 93922-6005
Telephone:  (714) 641-1232
Facsimile:   (888) 391-4105
Email:       tvogele@tvalaw.com

Attorneys for plaintiff Titan Energy Systems,
Inc. *dba* Pioneer Critical Power and Pioneer
eMobility

# UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT

## OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| TITAN ENERGY SYSTEMS, INC., a Minnesota corporation, | CASE NO.: |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. **BREACH OF WRITTEN CONTRACT;** |
| CRUISE, LLC, a Delaware limited liability company; GENERAL MOTORS, a Delaware corporation; GM CRUISE HOLDINGS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive, | 2. **PROMISSORY FRAUD** |
| | **\*\*\*JURY TRIAL DEMANDED\*\*\*** |
| Defendants. | Action Filed:   July 9, 2025 |
| | Trial Date:     Not Set |

- 1 -
**COMPLAINT**

2180-003; 154086.doc

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff TITAN ENERGY SYSTEMS, INC., a Minnesota corporation (hereinafter "Plaintiff"), complains and alleges against defendants CRUISE, LLC, a Delaware limited liability company ("Cruise"); GENERAL MOTORS COMPANY, a Delaware corporation ("GM"); GM CRUISE, LLC, a Delaware limited liability company; and DOES 1 through 10 (collectively "Defendants") as follows:

## THE PARTIES

1.      Plaintiff is a Minnesota corporation duly organized and existing under the laws of the State of Minnesota and is qualified and registered to do business in California, having its principal place of business in Champlin, Minnesota. Plaintiff is in good standing with the State of California. Plaintiff does business under the trade names of Pioneer Critical Power and Pioneer eMobility.

2.      Plaintiff is engaged in the manufacture, sale and service of electrical transmission, distribution and on-site power generation equipment. Included within the scope of Plaintiff's business is the manufacture and sale of portable electric vehicle charging systems, referred to as "e-Boost Mobile Off Grid EV Charging Units."

3.      Defendant Cruise is a Delaware limited liability company whose principal place of business is in San Francisco, California.  Plaintiff is informed and believes, and thereon alleges that Cruise is a wholly owned subsidiary of defendant GM.

4.      Defendant GM Cruise is a Delaware limited liability company whose principal place of business is in San Francisco, California.  Plaintiff is informed and believes, and thereon alleges that GM Cruise is a wholly owned subsidiary of defendant GM.

5.      Defendant GM is a Delaware corporation whose principal place of business is in Detroit, Michigan. GM is named as a defendant because Plaintiff is

- 2 -
**COMPLAINT**

unsure whether GM is directly or indirectly liable for the debts of its wholly owned subsidiaries, Cruise and GM Cruise.

6.     The true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, are unknown at the present time to Plaintiff, who therefore sues such Defendants by such fictitious names pursuant to California Code of Civil Procedure section 474.  Plaintiff is informed and believes, and thereon alleges, that each DOE defendant is responsible in some manner, whether by breach of contract, breach of warranty, breach of covenant, negligence, tort, or otherwise, for the occurrences herein alleged, in that Plaintiff's injuries and damages as herein alleged were proximately caused by said Defendants' acts, failures to act, representations, and omissions.  Plaintiff will amend this complaint to allege such DOE defendants' true names and capacities when ascertained.

7.     Except as otherwise specified herein, Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants, including unknown DOE defendants, was the agent and employee of each of its co-Defendants, and in doing the things herein mentioned, was acting under the scope of its authority as such agent and employee and with the permission and consent of each of its co-Defendants.

8.     Plaintiff is in some doubt as to whether it is entitled to redress from DOES 1 through 10, inclusive, and therefore all Defendants have been joined herein with the intent that the question as to whether all of them, or one or more of them, is liable to Plaintiff, and to what extent, be resolved; and that liability may be determined in this action; and that the Court may award judgment to Plaintiff as against Defendants, and each of them, either jointly, severally, or in the alternative.

## **JURISDICTION**

9.     This is an action to recover compensatory contract damages under the laws of the State of California and arises out of the transaction of business by

- 3 -
**COMPLAINT**

Defendants within the Northern District of California.  Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1), as this is a dispute between citizens of different states where the amount in controversy exceeds $75,000.

10.    This Court has personal jurisdiction over the Defendants because they are all engaged in ongoing business within the State of California.

11.    By conducting business within the forum state, consummating the transactions and committing the acts complained of herein, Defendants sought to avail themselves of the benefits of doing business in California.  Thus, it is not inequitable or unreasonable to hail them into this Court to answer for their conduct and actions as alleged herein.

## VENUE

12.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because it is the site of the events or omissions giving rise to the claims, and breach that is the subject of the action.

13.    Venue properly lies in this judicial district because the parties' contract includes the following provision, "Any suit or proceeding arising out of or relating to this Order must be commenced in a federal court in the Northern District of California or in a state court in San Francisco, California, and each party irrevocably submits to the jurisdiction and venue of such courts."

## GENERAL ALLEGATIONS

14.    On or about May 31, 2023, Plaintiff received and accepted purchase order #243510 (the "Contract") issued by Cruise. The Contract called for Plaintiff to manufacture and deliver three 240kW off-grid charging units. Plaintiff is informed and believes and thereon alleges that the charging units were intended for use by Cruise with its autonomous vehicle, or Robotaxi operations. Attached hereto

- 4 -
**COMPLAINT**

and incorporated by reference herein as **Exhibit "A"** is a true and correct copy of the Contract.

15.     Plaintiff immediately commenced work to fulfill its obligations under the Contract.

16.     On January 24, 2024, Cruise submitted a request to terminate a portion of the Contract.

17.     On May 1, 2024, Cruise agreed to accept delivery of one of the three units called for by the Contract in the fourth quarter of 2024 but retained an option to cancel the two remaining units.

18.     By September 23, 2024, Plaintiff had completed a substantial portion of the work required of it under the Contract and Cruise had not exercised its option to cancel any portion of the Contract.

19.     On or about September 23, 2024, Cruise notified Plaintiff of Cruise's intent to partially terminate the Contract. On that date, Cruise transmitted a document entitled "Partial Termination of Cruise Purchase Order 243510" (the "Termination Notice"). Attached hereto and incorporated by reference herein as **Exhibit "B"** is a true and correct copy of the Termination Notice.

20.     On or about October 8, 2024, Plaintiff acknowledged that it had received the Termination Notice. On October 31, 2024, Buck Lewis, Senior Director, executed the Termination Notice on behalf of Cruise.

21.     On or about December 10, 2024, GM publicly announced that it was shutting down Cruise's autonomous vehicle operations and transferring Cruise's operations and employees to GM. Attached hereto and incorporated by reference herein as **Exhibit "C"** is a true and correct copy of GM's press release.

22.     Cruise failed and refused to accept delivery of the one unit specified to be delivered by December 30, 2024, and failed to provide shipping instructions to Plaintiff for its delivery, despite Plaintiff's request.

2180-003; 154086.doc

23.     Plaintiff and Cruise thereafter engaged in discussions to reach agreement on what Cruise owed under the Contract, as modified.

24.     On or about April 10, 2025, a Cruise representative, Cecil St. Pierre, acknowledged the discussions and agreed that Cruise owed the amount requested by Plaintiff for the completed unit. Mr. St. Pierre informed Plaintiff by email that further discussions would be handled by GM.

25.     Based on those discussions, Plaintiff and Cruise agreed that the balance due to Plaintiff from Cruise was $877,586.80. Consequently, on or about April 22, 2025, Plaintiff issued Invoice #230622011, confirming the agreed-upon balance due after cancellation. Pursuant to the agreement between Plaintiff and Cruise, payment of Invoice #230622011 was due upon receipt. Attached hereto and incorporated by reference herein as **Exhibit "D"** is a true and correct copy of Invoice #230622011.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (Against All Defendants)

26.     Plaintiffs re-allege paragraphs 1 through 23, inclusive, as if fully set forth and restated herein.

27.     On or about May 31, 2023, an enforceable contract was formed between Plaintiff, on the one hand, and Cruise, on the other hand.  The terms of that written contract are contained in **Exhibit "A."**

28.     The Contract was modified by the parties and an agreement was made by which Cruise agreed to pay Plaintiff $877,586.80.

29.     Cruise breached its obligations under the Contract by failing to pay Invoice #23062011 as agreed.

30.     Plaintiff has not expressly or impliedly waived any of Cruise's breaches.

2180-003; 154086.doc

31.    Plaintiff has fully performed all obligations under the Contract except those that were excused or stayed by Cruise's antecedent breach.

32.    As a result of Cruise's breach, Plaintiff has been harmed in an amount subject to proof at trial, but in no case less than $877,586.80.

33.    Plaintiff is informed and believes, and thereon alleges, that pursuant to Section 27 of the Contract, it is entitled to recover its reasonable attorneys' fees and costs of suit if it prevails in this action.

## SECOND CAUSE OF ACTION
### PROMISSORY FRAUD
### (Against All Defendants)

34.    Plaintiffs re-allege paragraphs 1 through 25, inclusive, as if fully set forth and restated herein.

35.    Plaintiff was induced to modify the Contract by Cruise's promises to accept one unit by yearend 2024 and compensate Plaintiff for its costs incurred in connection with manufacturing units 2 and 3, costs that would otherwise have been avoidable absent Cruise's promises.

36.    Specifically, Cruise made these promises in bad faith to prevent Plaintiff from acting sooner to enforce the Contract and protect its financial interests therein.

37.    Cruise representatives reiterated their promises in April 2025, despite knowing that Cruise would not, or could not, perform them because of GM's decision to shut down Cruise's operations.

38.    Cruise made the promises with full knowledge that Plaintiff would rely on them to Plaintiff's detriment. Plaintiff's reliance on Cruise's promises was reasonable since Cruise, as a wholly owned subsidiary of one of the largest industrial companies in the world that had been held in high esteem for over one

**COMPLAINT**

2180-003; 154086.doc

hundred years, could be expected to adhere to the same high standards of conduct as GM.

39.    Plaintiff's reasonable reliance on Cruise's false promises was a substantial factor in causing Plaintiff's harm.

40.    As a result, Plaintiff has been harmed in an amount subject to proof at trial but believed to be more than $1 million plus the cost of bringing this lawsuit.

41.    Defendants, as part of one of the largest and most powerful companies in the world, engaged in conduct that was beyond a mere breach of contract and was instead designed to inflict financial harm on Plaintiff, a small company. Defendants' conduct was oppressive and fraudulent, such that it is fair and equitable to find Plaintiff's entitlement to punitive damages to punish Defendants and deter similar future conduct by them and others.

WHEREFORE, Plaintiff prays as follows:

On the First Claim for Relief for Breach of Written Contract

1.  Compensatory damages in an amount to be proven at trial, but in no case less than $877,586.80;
2.  Reasonable attorneys' fees as authorized by the Contract;
3.  Costs of suit, including all items recoverable pursuant to California Code of Civil Procedure §§ 1032 and 1033.5;
4.  Prejudgment interest as allowed by statute from the date of breach; and
5.  Such other and further relief as the Court deems just and proper.

On the Second Claim for Relief for False Promise

1.  Tort damages in an amount to be proven at trial, but believed to be more than $1 million;
2.  Reasonable attorneys' fees as authorized by the Contract;

**COMPLAINT**

3.  Costs of suit, including all items recoverable pursuant to California Code of Civil Procedure §§ 1032 and 1033.5;

4.   Exemplary damages in an amount to be determined at trial; and

5.  Such other and further relief as the Court deems just and proper.

DATED: July 9, 2025                    THOMAS VOGELE & ASSOCIATES, APC

By:_____
     Thomas A. Vogele
     Teddy T. Davis
     Attorneys for plaintiff Titan Energy
     Systems, Inc. *dba* Pioneer Critical Power
     and Pioneer eMobility

- 9 -
**COMPLAINT**

2180-003; 154086.doc

EXHIBIT A

Case 5:25-cv-05736 Document 1 Filed 07/09/25 Page 11 of 27



# CRUISE LLC
# PURCHASE ORDER

**Pioneer Critical Power**
8900 109th Ave N
suite 800
Champlin, MN 55316-3150
Attn: Michael Loe
mloe@pioneercriticalpower.com
Phone: +1 (320) 583-1375

| | |
|---|---|
| PO NUMBER | **243510** |
| DATE | **05/31/23** |
| PAYMENT TERMS | **Net 60** |
| SHIPPING TERMS | **FOB** |
| CURRENCY | **USD** |
| CONTRACT | |
| CONTACT | **Darren Hau** |
| | **darren.hau@getcruise.com** |

**Ship To**
CRUISE LLC
1201 Bryant Street
San Francisco, CA 94103
USACASFO0003
Attn: Darren Hau

**Bill To**
CRUISE LLC
333 Brannan Street
San Francisco, CA 94107
Attn: Accounts Payable

| Line | Description | Need By Date | Qty | Unit | Price | Total |
|---|---|---|---|---|---|---|
| 1 | Delivery | | 3 | Each | 9,000.00 | 27,000.00 |
| 2 | Pickup | | 3 | Each | 9,000.00 | 27,000.00 |
| 3 | Commissioning & Training | | 3 | Each | 6,000.00 | 18,000.00 |
| 4 | Equipment rental | | 3 | Each | 251,000.00 | 753,000.00 |
| 5 | Maintenance | | 3 | Each | 42,000.00 | 126,000.00 |

**951,000.00** USD

---

**Invoicing Instructions (*Please Read to be Paid on Time*):**

Include the following information on your invoice:

- PO Number (Required)
- First and Last Name of your Cruise business contact
- Cruise Ship to Location

Supplier will submit all invoices electronically by either:

- Coupa Supplier Portal ("CSP") https://supplier.coupahost.com/sessions/new
- Supplier Actionable Notifications, which can be flipped via PO email.
- Email invoice with PO number referenced to invoices@cruise.coupahost.com

Questions:

Case 5:25-cv-05736 Document 1 Filed 07/09/25 Page 12 of 27
Payment Inquiries or General Questions: ap@getcruise.com

---

## Terms and Conditions

1.     ORDER; ACCEPTANCE: Unless this order ("Order") is issued pursuant to an executed agreement between Cruise LLC or the Cruise affiliate issuing the Order ("Buyer") and the person or entity identified as seller ("Seller"), this Order and any attachments are the sole agreement between Buyer and Seller with respect to the products and/or services specified herein and supersedes all prior or contemporaneous oral or written agreements, representations, and/or communications. No other documents, including Seller's proposals, purchase orders, Seller's general terms and conditions of sale, invoices, quotations, acknowledgements, or any other document issued by Seller in connection with this Order become part of this Order unless approved in writing by Buyer. Written acceptance by Seller (including electronic acceptance), commencement of any work or performance of services called for hereunder, and/or invoicing of Buyer for services or goods corresponding to this Order shall constitute acceptance of this Order and its terms and conditions by Seller.

2.     PRICES AND TAXES: Unless otherwise specified, the prices in this Order shall not include applicable federal, state, and local taxes. Any taxes required by law to be paid by Buyer shall be invoiced separately. Buyer will not be responsible for any taxes charged by Seller that are not invoiced in this manner. Seller will not invoice or otherwise attempt to collect from Buyer any taxes for which Buyer has provided Seller with (i) a valid exemption certificate, (ii) or evidence of direct payment for such taxes. Seller will indemnify and hold Buyer harmless from any claims, costs (including reasonable attorneys' fees) and liabilities that relate to Seller's taxes. If the law requires Buyer to withhold taxes from payments to Seller, Buyer may withhold those taxes and pay them to the appropriate taxing authority.

3.     INVOICES, PAYMENT, SETOFF AND RECOUPMENT: Seller shall submit invoices showing the Order number, line item number, description of product/service, quantity, shipping costs (if applicable), unit prices, tax, extended totals, and any other information elsewhere specified. For shipments of products to Buyer, a bill of lading or express receipt must accompany each invoice. Payment of invoice(s) will not constitute acceptance of products/services and will be subject to adjustment for errors, shortages, defects in products/services or other failure of Seller to meet Order requirements. Buyer may at any time set off any amount owed by Buyer to Seller against any amount owed by Seller or any of its affiliated companies to Buyer. Unless otherwise specified herein, the payment term shall be net 60 days from receipt of a valid invoice, provided however that Buyer may withhold payment of any invoiced charge that Buyer disputes in good faith. The parties shall promptly work together in good faith to resolve any disputed charges. Seller shall continue performing its obligations under the Order notwithstanding any such dispute. All amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer, and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries.

4.     DISCOUNT: Time in connection with any discount offered by Seller will be computed from the latest of (i) scheduled delivery date; (ii) date of actual delivery; or (iii) date that an acceptable invoice is received. For the purpose of earning discounts, payment will be deemed to have been made on the date of mailing of Buyer's check or initiation of other electronic payment method.

5.     OVERSHIPMENTS: Buyer will pay only for quantities of goods and performance of services ordered. Overshipments will be held by Buyer at Seller's risk and expense for a reasonable time. Return shipping charges for excess quantities will be at Seller's expense.

6.     PACKING AND SHIPPING: Unless otherwise specified, when the price of this Order is based on weight of ordered goods, such price is to cover only net weight of material ordered. No charges are allowed for customs duties, insurance, packing, handling, transportation, storage or other packing requirements. Seller will package all products: (i) in accordance with good commercial practice; (ii) acceptable to common carriers for shipment at the lowest rate for particular products; (iii) in accordance with laws and regulations of the country of manufacture, the country of destination, and any country in which the goods will be transported, including, without limitation, laws and regulations governing the handling and transportation of dangerous goods or hazardous materials; and (iv) adequate to ensure safe arrival of goods at the named destination. Seller will mark all containers with necessary lifting, handling, and shipping information and with Order number, date of shipment, and names of consignee and consignor. An itemized packing list must accompany each shipment. No delivery will be made prior to the due date specified in the Order unless Buyer has given prior authorization. Upon request of Buyer, Seller agrees to promptly provide any documents or information necessary to release goods to Buyer.

7.    SHIPPING; RISK OF LOSS OR DAMAGE: Unless otherwise specified, the products ordered hereunder will be delivered on a D.D.P. (Incoterms 2020) delivery address basis. Notwithstanding any prior inspection and irrespective of the delivery point named herein, Seller will bear all risk of loss, damage or destruction to ordered products until final acceptance of products by Buyer at destination. Seller will bear the same risk with respect to any goods rejected by Buyer. Title to products will transfer to Buyer free and clear of any liens, claims, encumbrances, interests, or other rights at the moment the risk of loss transfers from Seller to Buyer in accordance with the delivery terms set forth herein or otherwise agreed to by the parties in writing.

8.    LATE DELIVERY: Seller will promptly notify Buyer of any prospective failure to ship goods or provide services on the delivery date specified in this Order. In the event that Seller's acts or omissions result in or are likely to result in late delivery, Seller shall take all actions necessary to expedite delivery, and Seller shall bear all costs and expenses associated with expedited shipping, including but not limited to payment of overnight shipping fees.

9.    WARRANTY: Seller warrants and guarantees that all products delivered (i) will be free from defects in design, workmanship, material, and manufacture, (ii) will comply with requirements of this Order or otherwise provided by Buyer, including any drawings, specifications, descriptions, and quality standards referenced herein or specified by Buyer in writing, and (iii) will be of merchantable quality and fit for the purposes intended by Buyer. Seller acknowledges that Seller knows of Buyer's intended use of the goods covered by this Order and warrants and guarantees that such goods are fit and sufficient for the particular purposes intended by Buyer. Seller warrants and guarantees that all services will be performed in a timely, diligent and competent manner in accordance with industry standards. The foregoing warranties are in addition to all other warranties express, implied, and required by law and will survive any delivery, inspection, acceptance or payment by Buyer. All warranties run to the benefit of Buyer and its customers. Buyer's approval of Seller's materials, samples or designs will not relieve Seller of any warranty obligations. If products delivered do not meet the warranties specified herein, Buyer may, at its option (i) require Seller to correct any defective or nonconforming products by prompt repair or replacement at no cost to Buyer, or (ii) return such defective or nonconforming product(s) to Seller at Seller's expense and promptly recover from Seller the Order price thereof, or (iii) correct the defective or nonconforming product(s) itself and charge Seller with the cost and expenses of such correction. Unless otherwise set forth, the duration of the warranty provided herein will begin on the date of the receipt of the goods by Buyer and end on the later of (i) the date of expiration of any warranty period specified by the Seller; (ii) the date of expiration of any warranty period provided under Applicable Law; (iii) the expiration of any warranty period or performance standard set forth in any document incorporated by reference into this Order, including Buyer's specifications or quality standards.

10.    SERVICES AND PERSONNEL: Any services set forth in this Order shall be performed by Seller Personnel. "Seller Personnel" means Seller's employees, subcontractors, representatives, and agents. Before assigning any Seller Personnel to perform services, Seller shall perform background checks on Seller Personnel. Seller's use of subcontractors requires written approval of Buyer. Background checks may have been performed as part of Seller's standard pre-employment screening process and will, to the extent permitted by Applicable Law, include the following: (1) social security verification; and (2) felony and misdemeanor criminal checks. Buyer may require Seller to provide written evidence of successful background checks. To the extent any subcontractors are engaged to perform the services, Seller will (a) remain directly responsible and liable to Buyer for the acts or omissions of each subcontractor and (b) ensure that each subcontractor is bound in writing to terms equally as protective of Buyer as the terms and conditions of this Order. Seller will assign Seller Personnel to perform the services who are properly trained, familiar with, and fully qualified to perform the services (including, without limitation, licensed in the relevant regions to provide work that requires a license). Seller will, at its own expense, obtain and maintain all applicable approvals, licenses, filings, or registrations necessary to perform the services. Seller represents and warrants that the provision of the services shall comply with Applicable Law. "Applicable Law" means all laws, statutes, codes, ordinances, regulations, codes, judgments, rules, permits and other legally binding requirements of all federal, state, and local government authorities applicable to any party's performance under this Order. To the extent Seller is granted access to Buyer's facilities, Seller will require Seller Personnel to comply with all Buyer policies (including safety, control, protection requirements), and Seller shall be solely responsible and liable for the acts or omissions of Seller Personnel while at any site. Buyer reserves the right to bar Seller Personnel from Buyer's facilities for failure to observe Buyer's policies or Applicable Law.

11.    INSPECTION AND ACCEPTANCE: Notwithstanding any prior payments, all products/services will be subject to final inspection and acceptance at Buyer's premises within a reasonable time after delivery. Seller waives any requirement that Buyer conducts incoming inspections. Payment for nonconforming goods will not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy or relieve Seller's responsibility for defects. In case any item is defective in material or workmanship, or otherwise not in conformity with the requirements of this Order, Buyer shall have the right to reject it, to require its correction, or to accept it with an adjustment in price. If Seller fails to

https://cruise.coupahost.com/supplier_order_headers/show_custom/243510?supplier_id=0&version=1

promptly replace or correct any defective item, Buyer may exercise its rights pursuant to Section 16 (Termination for Default). Any inspection or other action by Buyer under this Section shall not reduce or otherwise affect Seller's obligations under the Order, and Buyer shall have the right to conduct further inspections after Seller has carried out its remedial actions.

12.  CHANGE ORDERS: Buyer may from time to time, by written order, make changes within the general scope of this Order in any one or more of the following: (i) increase or decrease ordered quantities; (ii) change drawings, designs, or specifications; (iii) change method of shipping or packing; (iv) change place of delivery; (v) change scope of work and/or services (each such written order, a "Change Order"). If any such change(s) cause an increase or decrease in cost of, or time required for performance of any part of the work under this Order, Buyer shall make an equitable adjustment in the Order price, delivery schedule, or both, and shall modify the Order accordingly. Seller must assert its right to an adjustment under this clause within thirty (30) days from the date of receipt of the written Change Order. Failure to agree to any adjustment shall be a dispute under the dispute provisions set forth in Section 27 of this Order. However, nothing in this clause shall excuse Seller from proceeding with the Order as changed.

13.  INTELLECTUAL PROPERTY: This Section 13 applies if the Parties have not entered into a separate written agreement corresponding to the subject matter of this Order and with respect to the parties' Intellectual Property Rights. "Intellectual Property Rights" means any patent, patented articles, patent applications, designs, industrial designs, copyrights, software, source code, database rights, moral rights, inventions whether or not capable of protection by patent or registration, techniques, technical data, trade secrets, know how, and any other proprietary right, whether registered or unregistered, including applications and registrations thereof, all related and continuing rights, and all similar or equivalent forms of protection anywhere in the world. Intellectual Property Rights excludes all brands, trademarks, trade names, slogans and logos of Seller and Buyer unless specifically identified as a deliverable or work product of Seller pursuant to this Order. Except as set forth in this Order, each Party will own and retain all right, title, and interest to its Background IP. "Background IP" means any Intellectual Property Rights that pre-exists this Order; and (ii) Intellectual Property Rights arising outside the performance of the services in this Order. In the event Seller's performance of services hereunder includes the generation of results, work product, tools, or products unique to Buyer's specifications, requirements, or designs (including, but not limited to, software, drawings, schematics, documentation, photographs, recordings, graphics, musical compositions, and Intellectual Property Rights thereto) ("Deliverables"), Seller agrees that Buyer will own all rights, title, and interest in and to all parts of the Deliverables created in perpetuity, whether independently by Seller or jointly with Buyer. The Deliverables are considered the Confidential Information of Buyer. Seller hereby assigns and agrees to assign to Buyer all right, title, and interest in the Deliverables to Buyer. The Deliverables do not include Seller's Background IP. In the event moral rights cannot be waived, Seller will obtain releases, consents, or assignments such that Buyer may use, transfer, license, and exploit the Deliverables free and clear of any and all claims for royalties, infringement, and misappropriation by any third party. In the event that the Deliverables include copyrightable works, the works shall be considered "works made for hire," and in the event the works do not qualify as works made for hire, Seller hereby assigns to Buyer all right, title, and interest in all copyrights and moral rights therein. Seller will provide and cause Seller's Personnel to provide whatever assistance Buyer reasonably requires relating to the conduct of any claim, demand, interference, opposition, litigation, or other controversy in connection with the transfer of any rights to Buyer of the Deliverables. Seller hereby waives any and all claims that Seller has now or may hereafter have in any jurisdiction to any Intellectual Property Rights in the Deliverables, including so-called "moral rights" or rights of droit moral with respect to the Deliverables. Goods manufactured or designed based on or otherwise implementing Buyer's specifications, drawings, Confidential Information, and/or designs may not be used for Seller's own use or sold to third parties without the prior written authorization of Buyer.

14.  IP LICENSE: Except for purchases of commercial off-the-shelf products, Seller, without further cost to Buyer, hereby grants to Buyer (and to the extent requested by Buyer, to Buyer's customer) a non-exclusive, royalty-free, perpetual, irrevocable, transferable, fully paid-up, worldwide license to use, reproduce, modify, sell, import, export, disclose, display, and prepare derivative works based upon, sublicense, and distribute: (i) Seller's Background IP, proprietary information, or other intellectual property that Seller owned or had rights to prior to the commencement of performance (to the extent incorporated into products delivered to Buyer hereunder), and (ii) any invention, discovery, or work made, conceived, or reduced to practice in connection with the performance of the Order which are not Deliverables under Section 13. Buyer shall have the right to repair, reconstruct, remanufacture, reflash, rebuild, or otherwise service any goods delivered under this Contract.

15.  TERMINATION FOR CONVENIENCE: At any time, Buyer may terminate work under this Order for convenience, in whole or in part, by written notice. Upon such termination Seller will, to the extent and at times specified by Buyer, stop all work under this Order, place no further orders for materials to complete the work, assign to Buyer all Seller's interests under terminated subcontracts and orders, settle all claims thereunder after obtaining Buyer's approval, protect all property in which Buyer has or may acquire an interest, and transfer title and make delivery to Buyer of all articles, products, materials, work in process,

and other items held or acquired by Seller in connection with the terminated portion of this Order. Seller will proceed promptly to comply with Buyer's instructions respecting each of the foregoing without awaiting settlement or payment. Unless otherwise agreed by the parties, Buyer will pay Seller the following amounts: (i) the contract price for all items completed or services rendered in accordance with this Order and not previously paid for; (ii) actual costs incurred by Seller which are properly allocable under recognized commercial accounting practices to the terminated portion of this Order, plus a mutually agreed profit on such costs (but if it appears Seller would have sustained a loss on the Order, no profit will be allowed, and an adjustment will be made reducing the amount of the settlement to reflect the indicated rate of loss); and (iii) reasonable costs incurred by Seller in making settlement hereunder and in protecting property in which Buyer has or may acquire an interest. Payment made under subparagraphs (i) and (ii) above may not exceed the aggregate price specified in this Order, less payments otherwise made or to be made. Any amounts payable for property lost, damaged, stolen, or destroyed prior to delivery to Buyer will be excluded from amounts otherwise payable to Seller.

16. TERMINATION FOR DEFAULT: Buyer may, by written notice of default to Seller, terminate this Order in whole or in part in any one of the following circumstances: If Seller (a) fails to deliver products or perform services within the time specified herein, or (b) breaches any provision of this Order or fails to make progress so as to endanger performance of this Order in accordance with its terms, and in either of these two circumstances, does not cure such failure within a period of ten (10) days (or such longer period as Buyer may authorize in a prior writing) after receipt of said notice of default from Buyer. In the event Buyer terminates this Order for default, Buyer may take over such terminated work and prosecute the same to completion by contract or otherwise, and Seller shall be liable to Buyer for any excess costs for such work. Seller shall continue performance of this Order to the extent not terminated. Buyer may require Seller to transfer title to, and deliver to the extent directed by Buyer (i) any completed products and (ii) such partially completed products as Seller has specifically produced or specifically acquired for performance of such part of this Order as has been terminated. Seller shall, upon direction of Buyer, protect and preserve property in possession of Seller in which Buyer has an interest. Payment for completed products delivered to and accepted by Buyer shall not exceed the Order price. If, after said notice of termination, it is determined that Seller was not in default, or in the case of an excusable delay in delivery, the rights and obligations of the parties hereto shall be the same as if notice of termination had not been issued. Remedies stated herein are in addition to all other remedies at law or in equity.

17. FORCE MAJEURE: Seller shall be excused for any delay in the delivery of product or services procured hereunder as a result of any act of God, acts of a public enemy, acts of governments in their sovereign capacity, natural disasters, fire, war and insurrection, epidemics, quarantine restrictions, strikes, lockouts, or other industrial disputes, sabotage, breakdowns, and embargoes; which in every case, are beyond the reasonable control of Seller, are not foreseeable, are not addressable or avoidable by commercially reasonable alternatives, and without fault or negligence of Seller and/or its subcontractors. If delivery of products or performance of services are to be delayed, Seller shall immediately notify Buyer in writing and Buyer may at its option (a) extend time of performance or (b) immediately terminate this Order in whole or in part upon written notice to Seller and receive a refund of any amounts pre-paid for any services, goods, and deliverables not received by Buyer.

18. INSURANCE: Seller and its subcontractors at all tiers shall obtain and maintain such insurance coverage as is customary in Seller's industry and is no less than that required by Applicable Law, including Workers Compensation/Employers' Liability or the local equivalent coverage with statutory limits, including Employer's Liability insurance of at least One Million Dollars (USD $1,000,000) per employee per accident. Seller shall also maintain Commercial General Liability or the local equivalent insurance in an amount of no less than Two Million Dollars (USD $2,000,000) each occurrence. If provision of any services in this Order requires operation of a motor vehicle by Seller, Seller shall maintain automobile liability insurance in an amount of no less than One Million Dollars (USD $1,000,000) per occurrence. If requested by Buyer, Seller shall provide copies of its certificate(s) of insurance reasonably satisfactory to Buyer within ten (10) days of Buyer's request. The certificate(s) will provide that Buyer will receive thirty (30) days' prior written notice before any termination or reduction in the amount or scope of coverage. Seller shall provide Buyer with ten (10) days' advance written notice in the event of a cancellation or material change in Seller's insurance policy.

19. INDEMNIFICATION: Seller agrees to defend, indemnify and hold harmless Buyer and its affiliates and their customers, directors, officers, members, successors, assigns, employees, suppliers (including providers of software or services) and representatives ("Indemnitees") from and against any and all claims, costs, losses, expenses, and liabilities (including reasonable attorney's fees) ("Claims") arising as a result of (a) death or personal injury (including bodily injury) to any person or (b) destruction or damage to any tangible property, in each case to the extent caused by the breach, negligence, or misconduct of Seller or its affiliates, or their agents or representatives. Seller further agrees to defend, indemnify and hold harmless the Indemnitees from any Claim alleging that a product or service of Seller or its use by Buyer infringes, violates, or misappropriates any intellectual property rights of any third party. Seller will defend such Claim with counsel reasonably acceptable to Buyer and will not settle any Claim containing

an admission of liability by Buyer, or that imposes any financial or other obligation or liability on Buyer, without Buyer's prior written consent. Seller further agrees to indemnify the Indemnitees against any and all liability and expense resulting from any alleged defects in goods, whether latent or patent, including allegedly improper construction and design, or from failure of goods to comply with any drawings and/or specifications.

20. LIMITATION OF LIABILITY: TO THE EXTENT PERMITTED BY APPLICABLE LAW, BUYER SHALL NOT BE LIABLE FOR ANY LOST REVENUES, LOST PROFITS, INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER OR NOT BUYER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. BUYER'S AGGREGATE LIABILITY UNDER THIS ORDER, OR ANY OTHER LEGAL OR EQUITABLE THEORY, SHALL NOT EXCEED AN AMOUNT EQUAL TO THE FEES PAID OR PAYABLE TO SELLER PURSUANT TO THIS ORDER.

21. NON-DISCLOSURE OF CONFIDENTIAL INFORMATION: Except as otherwise provided herein, neither Buyer nor Seller will use or disclose to any third party any of the other's Confidential Information without the disclosing party's prior written consent. Seller will not quote for sale to others, without Buyer's written authorization, any goods purchased under Buyer's specifications or drawings. All specifications, drawings, samples, and other data furnished by Buyer will be treated by Seller as Buyer's Confidential Information, will remain Buyer's property, and will be returned to Buyer or securely disposed of upon Buyer's request. Buyer's Confidential Information includes confidential information of its customers. As used herein, "Confidential Information" includes all information that is (i) disclosed in tangible form and conspicuously designated as "Confidential," (ii) disclosed orally or by electronic media that is identified at or prior to the time of disclosure as confidential, or (iii) any other non-public information which, by the nature of the circumstances surrounding the disclosure, should reasonably be understood by the receiving party to be confidential. A receiving party may disclose Confidential Information if required by a valid judicial or governmental order, provided that such party takes reasonable steps to first give the other party sufficient prior notice to contest such order, and provided further, that the party subject to such valid judicial or governmental order shall only disclose that portion of the Confidential Information required to be disclosed by the judicial or governmental order. The confidentiality obligations set forth herein shall survive the expiration or termination of this Order.

22. DATA PRIVACY AND DATA SECURITY: If any data disclosed to Seller or processed by Seller consists of "personal information" or "personal data" (as defined under applicable Data Privacy Laws), Seller shall not access, collect, store, retain, transfer, use or otherwise process such data except: (i) in the interest and on behalf of Buyer; (ii) as directed by authorized personnel of Buyer in writing; and (iii) solely for purposes of performing this Order and in accordance with all applicable privacy laws including, without limitation, the European General Data Protection Regulation (GDPR), the United Kingdom version of the GDPR, the California Consumer Privacy Act (CCPA), and the China Personal Information Protection Law (collectively, "Data Privacy Laws"). If Seller accesses or handles any Buyer data, including but not limited to personal data, Seller agrees that it will implement and maintain industry-standard information security policies and processes that prevent unauthorized access, disclosure, and/or use of Buyer data. Seller agrees to comply with any Buyer policies communicated to Seller with regard to security and storage of Buyer's data.

23. AUDIT: For one year following this Order, Seller agrees to provide information on and submit to reasonable compliance, data security, and privacy compliance audits by Buyer or, at Buyer's request, by an independent third party or customer of Buyer, to verify compliance with the material provisions of this Order, data security and privacy requirements, and Applicable Law.

24. COMPLIANCE. Seller represents and warrants that the products sold and/or the provision of any services in accordance with this Order comply with Applicable Law. Without limiting the foregoing, Seller will comply with the US Foreign Corrupt Practices Act (FCPA), the UK Bribery Act, all applicable export control laws and economic sanctions laws and regulations, and all relevant laws concerning forced labor and human trafficking. Furthermore, at Buyer's request, Seller will execute and deliver to Buyer declarations in the form of the EICC-GESI Conflict Minerals Reporting Template as adopted by EICC-GESI from time to time, or in any other form that Buyer reasonably requests, demonstrating to Buyer's satisfaction that Seller is Conflict Free (as defined in Section 1502 of the United States Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended) with respect to all items supplied to Buyer. Upon Buyer's request, Seller will certify in writing, and provide necessary documentation to confirm that Seller is in compliance with this Section. Seller shall indemnify and hold Buyer harmless for all claims, demands, damages, costs, fines, penalties, attorney's fees and other expenses arising from Seller's failure to comply with this clause.

25. SUPPLIER CODE OF CONDUCT: If this Order pertains to materials for incorporation into Buyer's hardware products, Seller certifies that it will comply with the Cruise Supplier Code of Conduct, available for review at www.getcruise.com/supplier-code-of-conduct, and agrees to cooperate with Buyer's efforts to verify such compliance.

26.   GENERAL: Seller may not assign this Order without Buyer's prior written consent. Non-permitted assignments are void. If any provision is found to be unenforceable, it (and related provisions) will be interpreted to best accomplish the parties' intended purpose. Amendments must be in writing and signed by Buyer. Waivers must be signed by the waiving Party and one waiver will not imply any future waiver. This Order will be deemed to have been made in, and will be construed pursuant to the laws of, the State of California and the United States without regard to conflicts of laws provisions thereof, and without regard to the United Nations Convention on the International Sale of Goods.  Any suit or proceeding arising out of or relating to this Order must be commenced in a federal court in the Northern District of California or in a state court in San Francisco, California, and each party irrevocably submits to the jurisdiction and venue of such courts. This Order is non-exclusive; nothing herein prohibits Buyer from entering into any similar agreement with any other party. Seller shall not make any public statements about the Order or the parties' relationship (including, without limitation, in any marketing materials) or use Buyer's name, logo or marks without Buyer's prior written approval in each case. No online (clickwrap, browsewrap, or other) posted terms of service or privacy policy, or Seller's ordering or invoicing documents, apply to Buyer.

EXHIBIT B

September 23, 2024

Pioneer Critical Power
8900 109th Ave N
Suite 800
Champlin, MN 55316-3150
Attn: Geo Murickan
geo@pioneer-emobility.com
Phone: +1 (909) 532-1968

RE:   Partial Termination of Cruise Purchase Order 243510

To Whom it May Concern,

Cruise LLC ("Cruise") and Pioneer Critical Power ("Pioneer") are parties to that certain Cruise Purchase Order 243510 dated as of May 31, 2023 (the "PO"). Pursuant to Section 15 of the PO, Cruise hereby provides notice that Cruise wishes to partially terminate the PO, effective as of March 29, 2024 (the "Termination Date"). Such termination shall include the material, labor, and services associated with e-Boost Unit #2 and e-Boost Unit #3 of the products and services set forth in the PO. Following the Termination Date, Cruise shall have no obligation or liability with respect to e-Boost Unit #2 and e-Boost Unit #3, including any obligation to compensate Pioneer therefore.

Please sign below to verify that you've received this termination notice.

PIONEER CRITICAL POWER.

By: _____

Name: Geo Murickan

Title: President and CEO

Date: October 8, 2024

CRUISE LLC

By: _____

Name: Buck Lucas

Title: Senior Director

Date: 10/31/2024

EXHIBIT C

# GM to refocus autonomous driving development on personal vehicles

Tue, December 10, 2024

**DETROIT** – General Motors (NYSE: GM) plans to realign its autonomous driving strategy and prioritize development of advanced driver assistance systems on a path to fully autonomous personal vehicles. GM will build on the progress of Super Cruise, the company's hands-off, eyes-on driving feature, now offered on more than 20 GM vehicle models and currently logging over 10 million miles per month.

GM intends to combine the majority-owned Cruise LLC and GM technical teams into a single effort to advance autonomous and assisted driving. Consistent with GM's capital allocation priorities, GM will no longer fund Cruise's robotaxi development work given the considerable time and resources that would be needed to scale the business, along with an increasingly competitive robotaxi market.

"GM is committed to delivering the best driving experiences to our customers in a disciplined and capital efficient manner," said Mary Barra, chair and CEO of GM. "Cruise has been an early innovator in autonomy, and the deeper integration of our teams, paired with GM's strong brands, scale, and manufacturing strength, will help advance our vision for the future of transportation."

"As the largest U.S. automotive manufacturer, we're fully committed to autonomous driving and excited to bring GM customers its benefits – things like enhanced safety, improved traffic flow, increased accessibility, and reduced driver stress," said Dave Richardson, senior vice president of software and services engineering.

GM, which owns about 90% of Cruise, has agreements with other shareholders that will raise its ownership to more than 97%. The company will pursue the acquisition of the remaining shares. Contingent upon the repurchase of these shares and Cruise board approval, GM will work with the Cruise leadership team to restructure and refocus Cruise's operations. GM expects the restructuring to lower spending by more than $1 billion annually after the proposed plan is completed, expected in the first half of 2025.

GM will host a conference call for analysts at 4:30 p.m. ET featuring GM Chair and CEO Mary Barra, Executive Vice President and CFO Paul Jacobson, and David Richardson, senior vice president of software and services engineering.

Conference call details are as follows:

- 1-800-857-9821 (U.S.)
- 1-517-308-9481 (international/caller-paid)
- **Conference call passcode:** General Motors
- An audio replay will be available in the <u>Events Section</u> of the GM Investor Relations website.

General Motors (NYSE:GM) is driving the future of transportation, leveraging advanced technology to build safer, smarter, and lower emission cars, trucks, and SUVs. GM's <u>Buick,</u> <u>Cadillac,</u> <u>Chevrolet</u>, and <u>GMC</u> brands offer a broad portfolio of innovative gasoline-powered vehicles and the industry's widest range of EVs, as we move to an all-electric future. Learn more at <u>GM.com</u>.

*Cautionary Note on Forward-Looking Statements: This press release and related comments by management the document incorporated herein by reference and related comments by management, may include "forward-looking statements" within the meaning of the U.S. federal securities laws. Forward-looking statements are any statements other than statements of historical fact. Forward-looking statements represent our current judgment about possible future events and are often identified by words like "aim," "anticipate," "appears," "approximately," "believe," "continue," "could," "designed," "effect," "estimate," "evaluate," "expect," "forecast," "goal," "initiative," "intend," "may," "objective," "outlook," "plan," "potential," "priorities," "project," "pursue," "seek," "should," "target," "when," "will," "would," or the negative of any of those words or similar expressions. In making these statements, we rely on assumptions and analysis based on our experience and perception of historical trends, current conditions and expected future developments as well as other factors we consider appropriate under the circumstances. We believe these judgments are reasonable, but these statements are not guarantees of any future events or financial results, and our actual results may differ materially due to a variety of important factors, many of which are beyond our control. These factors, which may be revised or supplemented in subsequent reports we file with the SEC, include, among others, the following: (1) our ability to deliver new products, services, technologies and customer experiences; (2) our ability to timely fund and introduce new and improved vehicle models; (3) our ability to profitably deliver a broad portfolio of electric vehicles (EVs); (4) the success of our current line of internal combustion engine vehicles; (5) our highly competitive industry; (6) the unique technological, operational, regulatory and competitive risks related to the timing and commercialization of autonomous vehicles (AVs), including the various regulatory approvals and permits required for operating driverless AVs in multiple markets; (7) risks associated with climate change; (8) global automobile market sales volume; (9) inflationary pressures, persistently high prices, uncertain availability of raw materials and commodities, and instability in logistics and related costs; (10) our business in China, which is subject to unique operational, competitive, regulatory and economic risks; (11) the success of our ongoing strategic business relationships and of our joint ventures; (12) the international scale and footprint of our operations, which exposes us to a variety of unique political, economic, competitive and regulatory risks; (13) any significant disruption at any of our manufacturing facilities; (14) the ability of our suppliers to deliver parts, systems and components without disruption and at such times to allow us to meet production schedules; (15) pandemics, epidemics, disease outbreaks and other public health crises; (16) the possibility that competitors may independently develop products and services similar to ours, or that our intellectual property rights are not sufficient to prevent competitors from developing or selling those products or services; (17) our ability to manage risks related to security breaches and other disruptions to our information technology systems and networked products; (18) our ability to comply with increasingly complex, restrictive and punitive regulations relating to our enterprise data practices; (19) our ability to comply with extensive laws, regulations and policies applicable to our operations and products, including those relating to fuel economy, emissions and AVs; (20) costs and risks associated with litigation and government investigations; (21) the costs and effect on our reputation of product safety recalls and alleged defects in products and services; (22) any additional tax expense or exposure or failure to fully realize available tax incentives; (23) our continued ability to develop captive financing capability through General Motors Financial Company, Inc.; (24) any significant increase in our pension funding*

*requirements; (25) changes in our strategic plans and accounting, including with respect to Cruise ; (26) the possibility that we will not be able to acquire all of the outstanding Cruise shares; (27) the possibility that potential restructuring charges and expenses will differ from our expectations; and (28) the possibility that our planned actions will not have the impacts we expect or intend. A further list and description of these risks, uncertainties and other factors can be found in our most recent Annual Report on Form 10-K and our subsequent filings with the SEC. We caution readers not to place undue reliance on forward-looking statements. Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update publicly or otherwise revise any forward-looking statements, whether as a result of new information, future events or other factors, except where we are expressly required to do so by law.*

###

**CONTACTS:**

Jim Cain

GM Communications

+1 313-407-2843

james.cain@gm.com

Kevin Kelly

GM Communications

kevin.m.kelly@gm.com

+1 313-316-9742

Ashish Kohli

GM Investor Relations

Ashish.kohli@gm.com

+1 847-964-3459

EXHIBIT D

 **PIONEER**
CRITICAL POWER

8900 109th Ave N Suite 800
Champlin, MN 55316
Phone: 952-960-2371
Fax: 952-938-3290
Website: www.pioneercriticalpower.com

# Invoice

| | |
|---|---|
| DATE | 4/22/2025 |
| INVOICE # | 230622011 |
| PO # | 243510 |
| DUE DATE | Due Upon Receipt |

**BILL TO**
CRUISE LLC
333 Brannan Street
San Francisco, CA 94107

**Location Name/Ship to:**
CRUISE LLC
1201 Bryant Street
San Francisco, CA 94103
USACASFO0003

| DESCRIPTION | QTY | AMOUNT |
|---|---|---|
| Costs incurred to fulfill PO 243510 –Equipment-  e-Boost Mobile Off Grid EV Charging Unit #1 | 1 | 877,586.80 |
| | | |
| Cruise Business Contact:  Cecil St Pierre | | |
| Darren Hau | | |

| | |
|---|---|
| Subtotal | 877,586.80 |
| Taxable | |
| Tax rate | |
| Tax due | |
| Other | - |
| **TOTAL** | $    877,586.80 |

**OTHER COMMENTS**
Remit to:
Titan Energy Systems DBA Pioneer Critical Power
8900 109th Ave. North Suite 800
Champlin, MN 55316
To pay by ACH: JPMorgan Chase
Account #80012638094    ABA/Routing #021202337  Swift Code: CHASUS33

If you have any questions about this invoice, please contact
AR@pioneercriticalpower.com
*Thank You For Your Business!*